**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MICHELLE ROMERO, as Sister and
Next Friend of Alejandro Romero, Jr.,

        Plaintiff,

vs.                                                No. CIV 15-0389 JB/SMV

BOARD OF COUNTY COMMISSIONERS FOR THE
COUNTY OF CURRY, GERRY BILLY, TORI
SANDOVAL, and ECIPIO LUCERO, CORRECT
CARE SOLUTIONS, ANDREW FOTOPOLUS, and
JOHN DOE #1,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendants' Rule 12(c) Motion for

Judgment on the Pleadings, filed May 5, 2016 (Doc. 97)("Motion").  The Court held a hearing on

August 8, 2016.  The primary issues are: (i) whether Plaintiff Michelle Romero, as sister and

next friend of Alejandro Romero, Jr., sufficiently states a claim under rule 12(c) of the Federal

Rules of Civil Procedure for violation of A. Romero's procedural due process rights under the

Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of

America when she alleges that A. Romero was placed in segregation without a hearing or

classification review and endured "inhumane" conditions of confinement; (ii) whether M.

Romero may allege both a procedural due-process claim for confinement in segregation with no

hearing and a substantive due-process claim for the Defendants' deliberate indifference to A.

Romero's suffering in inhumane conditions; (iii) whether M. Romero plausibly states a claim

under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"), for

discrimination or failure to accommodate A. Romero's disability -- paranoid schizophrenia --

when the Defendants denied A. Romero access to the Curry County Curry Detention Center's services and programs; and (iv) whether M. Romero may plead as a separate count her claim that Defendants Board of County Commissioners for the County of Curry, Gerry Billy, in his official capacity, and Tori Sandoval, in her official capacity, had a custom and policy that deprived the mentally ill of adequate medical care and humane conditions under Monell v. Department of Social Services, 436 U.S. 658 (1978)("Monell").   First, M. Romero adequately alleges a procedural due-process claim by asserting that the Defendants confined A. Romero in punishing conditions that were excessive in relation to any legitimate governmental interest without providing any hearings or reviews.  Second, because the procedural due-process claim asserts a different injury against different Defendants than the substantive due-process claim, the substantive due-process claim is not precluded.  Third, although M. Romero alleges some factual allegations that do not constitute an ADA violation, she alleges other factual allegations which, if true, state an ADA claim.  Finally, although Monell liability is not an independent, free-standing claim, the Defendants have not pointed to any law from the United States Court of Appeals for the Tenth Circuit that precludes plaintiffs from pleading it as a separate count for clarity. Accordingly, the Court denies the Motion.

## FACTUAL BACKGROUND

M. Romero sues on behalf of her brother, A. Romero.  See Amended Complaint for the Recovery of Damages Caused by the Deprivation of Civil Rights, filed March 14, 2016 (Doc. 83)("Amended Complaint").[1]  M. Romero alleges that A. Romero "has a long history of mental illness and has been diagnosed with paranoid schizophrenia."  Amended Complaint ¶ 22, at 3.

---

[1]M. Romero refers to A. Romero in the Complaint as "Alex."  Amended Complaint ¶ 2, at 1.

She states that, when "un-medicated, Alex has experienced psychotic episodes that have led to several arrests for misdemeanors, such as assault on a household member and criminal damage to property of a household member."  Amended Complaint ¶ 23, at 3.  Between 2009 and 2013, A. Romero was arrested and booked into the Curry County Detention Center four times.  See Amended Complaint ¶ 24, at 4.

The Curry Detention Center administrators,[2] including Billy, the Administrator of the Curry Detention Center until January, 2013, and Sandoval, the current Curry Detention Center Administrator, "routinely complete[] an 'Initial Classification & Custody Assessment Scale' form when an inmate is booked that asks a series of questions about the inmate, and results in a scale score that indicates where the inmate should be placed."  Amended Complaint ¶ 117, at 12. For A. Romero, however, the "Defendants failed [to] complete the initial assessment form, failed to meaningfully classify Alex, and arbitrarily placed him into solitary confinement based solely on his mental health problems."  Amended Complaint ¶ 118, at 12.  Moreover, the Defendants "failed to have any classification review thereafter."  Amended Complaint ¶ 118, at 12.  Instead, the Defendants "placed Alex in a steel segregation cell due to his 'mental problems.'"  Amended Complaint ¶ 25, at 4.  See Amended Complaint ¶¶ 4-7, at 2.  "Alex spent eight months in solitary confinement without a hearing or reassessment."  Amended Complaint ¶ 121, at 12-13.  A. Romero "had no access to the ordinary services provided to inmates in the jail" because of "his mental illness," including "visitation, group therapy, religious services and recreation."  Amended Complaint ¶ 129, at 13.

_____

[2]M. Romero refers to Billy, Sandoval, and Defendant Ecipio Lucero, a high-ranking official with supervisory duties at the Curry Detention Center, as the Jail Defendants, because they all worked for the Curry Detention Center.  Accordingly, the Court will similarly refer to them as the Jail Defendants.

M. Romero also sues Defendant Correct Care Solutions, the purchaser and successor in interest to Correctional Healthcare Companies, L.L.C.   See Amended Complaint ¶ 20, at 3. Correct Care provided health care to inmates at the Curry Detention Center during the events material to the Amended Complaint.   Amended Complaint ¶ 21, at 3.   Correct Care employed Defendant John Doe #1, who "was in charge of medical care at CCDC."   Amended Complaint ¶ 17, at 3.   Defendant Andrew Fotopolus[3] was "in charge of providing mental health counseling" at the Curry Detention Center.   Amended Complaint ¶ 14, at 3.   During A. Romero's incarceration, the "Defendants failed to ensure Alex was consistently taking his antipsychotic medication," even though they "knew how important it was for Alex to take his antipsychotic medication."   Amended Complaint ¶¶ 37-39, at 4.   The "Defendants accepted Alex's refusal to take his medication because it was 'pink.'"   Amended Complaint ¶ 40, at 5.   M. Romero notes that courts have previously declared A. Romero "incompetent to stand trial due to his mental illness."   Amended Complaint ¶ 27, at 4.   She explains that, when unmedicated, "Alex's mental health deteriorated in his segregation cell."   Amended Complaint ¶ 42, at 5.

A. Romero "spent hours on the floor under his bed 'rocking', talking to himself, and naked," and would "tear his bed mattress to pieces."   Amended Complaint ¶¶ 42-44, at 5.   M. Romero describes how the Defendants "denied Alex access to a mattress, forcing Alex to sleep on the metal bed frame or on the floor under the bed."   Amended Complaint ¶ 45, at 5.   Jail documents indicate that A. Romero "smeared his feces in the cell on February 8, 2013, and again on February 16, 2013," and "was forcibly restrained" on February 27, 2013.   Amended Complaint ¶¶ 49-50, at 6.   Sergeant Mary Lujan, who worked in the segregation pod where A. Romero was housed, described A. Romero "as being confined in a foul smelling cell for long

---

[3]Correct Care, Fotopolus, and John Doe do not join this Motion.

periods of time without recreation, visitation, phone calls or other activities for long periods of time." Amended Complaint ¶ 112, at 12. She described his "conditions of confinement as being inhumane." Amended Complaint ¶ 113, at 12. One inmate "described how the whole segregation unit would fill with a disgusting odor whenever Alex's door was opened." Amended Complaint ¶ 101, at 11. Another inmate "remembers Alex being sprayed down with a water hose like a dog" and "seeing Alex lose a great deal of weight while he was incarcerated." Amended Complaint ¶¶ 104-105, at 11. Curry Detention Center officers "would not let Alex out of his cell for recreation," and "his cell would only be cleaned when the smell became so bad the guards could not take it anymore." Amended Complaint ¶ 107, at 11. His cell was filled with "feces on the ceiling and urine everywhere." Amended Complaint ¶ 109, at 11.

After Lucero asked a court to transfer A. Romero to the Department of Corrections, the court "ordered a thirty-day commitment to the New Mexico Behavioral Health Institute (NMBHI)"[4] in Las Vegas, New Mexico. Amended Complaint ¶¶ 53-55, at 6. A. Romero "spent seven months in the segregation cell under inhumane conditions" before being transferred to the NMBHI. Amended Complaint ¶ 56, at 6. In his first two days at NMBHI, A. Romero "was not making sense in conversation, threatening doctors, talking to himself, and asked the nursing stall for 'venom' so the spiders would stop biting him." Amended Complaint ¶ 59, at 7. During his stay at NMBHI, he "was reintroduced to human interaction and socialization," helping him to become "cooperative, polite, and displaying appropriate hygiene." Amended Complaint ¶¶ 63-64, at 7. "On May 14, 2013, Alex was released from NMBHI medication compliant and 'happy.'" Amended Complaint ¶ 66, at 7.

---

[4]The NMBHI "is the only state owned and operated psychiatric hospital in New Mexico. NMBHI is made up of five clinical divisions serving a wide range of public needs." New Mexico Behavioral Health Institute, New Mexico Department of Health, http://nmhealth.org/about/ofm/ltcf/nmbhi/ (last visited August 13, 2016).

**PROCEDURAL BACKGROUND**

M. Romero seeks damages for the alleged violation of A. Romero's civil and constitutional rights under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and the Constitution of the United States.  See Amended Complaint at 1.  She sues the Board of the County Commissioners for the County of Curry, State of New Mexico ("Curry County"), Sandoval, Billy, Lucero, Correct Care, Andrew Fotopolus, and John Doe.  M. Romero asserts four claims against the Defendants.  In Count I, she alleges a violation of substantive due process under the Constitution of the United States based on the Defendants' inhumane treatment and inadequate medical care against Sandoval, Billy, and Lucero.  See Amended Complaint ¶¶ 67-95, at 7-10.  In Count II, she asserts a claim for violation of procedural due process under the Constitution of the United States.  See Amended Complaint ¶¶ 96-121, at 10-13.  In Count III, she alleges an ADA violation against Curry County, Billy, and Sandoval in their official capacity.  See Amended Complaint ¶¶ 122-139, at 13-14.  In Count IV, she contends that Curry County, Billy, and Sandoval had a "custom and policy of violating constitutional rights" by depriving the mentally ill of "adequate medical care and humane conditions of incarceration." Amended Complaint ¶¶ 140-156, at 14-16.  Finally, in Count V, M. Romero alleges that Correct Care, Fotopolus, and John Doe provided inadequate medical care.  See Amended Complaint ¶¶ 157-183, at 16-19.

**1.      The Motion.**

On May 5, 2016, Curry County, Sandoval, and Lucero moved the Court to dismiss Counts I, II, III, and IV with prejudice, or, in the alternative, grant qualified immunity to the individual capacity defendants.  See Motion at 1.  They explain that, when the police took A. Romero to the Curry Detention Center, detention staff transported A. Romero to Plains Regional Medical Center in Albuquerque, New Mexico.  See Motion at 2.  They assert that, because Plains

- 6 -

Regional medically cleared A. Romero, "the defendants had no choice but to accept Mr. Romero into the facility," where he "was placed into special management due to the danger he posed." Motion at 2.  The Jail Defendants argue that the Court must dismiss "the ADA, *Monell*, the substantive due process prong of the Fourteenth Amendment, [and] the procedural due process prong," because M. Romero fails to state a claim under rule 12.  Motion at 6.

Regarding the procedural due-process claim, the Jail Defendants explain that the claim requires "either an element of punishment or an illustration that the conditions of confinement were excessive in relation to the purpose assigned to them."  Motion at 6.  The Jail Defendants argue that they had a "legitimate governmental purpose" for housing A. Romero in solitary confinement -- jail security -- so they did not punish A. Romero.  Motion at 10-11.  Furthermore, the Jail Defendants assert that Lucero did not have authority to force A. Romero to take medications and did not participate in A. Romero's initial classification to solitary confinement, so there "is no basis for any claim against Mr. Lucero."  Motion at 7.  The Jail Defendants contend that, similarly, Sandoval arrived "five months after Mr. Romero was booked," so the Amended Complaint does "not illustrate personal participation in any deprivation of a constitutional right."  Motion at 8.  They explain that there "is no clearly established right to be housed in general population when suffering from a serious mental illness" or to "forced medications," so the Jail Defendants are entitled to qualified immunity.  Motion at 8.  They note that, because many of the Amended Complaint's factual allegations might have occurred at "times [] outside the statute of limitations," the due-process claim lacks plausibility and the Court should dismiss it.  Motion at 9.

Next, the Jail Defendants argue that M. Romero's substantive due-process claim "failed to plausibly plead that these movants deprived him of medical care."  Motion at 14.  The Jail

Defendants contend that there "is no clearly established right to forced medications" or "for detention staff to overrule medical professionals."  Motion at 15.  They assert that, M. Romero therefore "fails to state a plausible claim against the movants related to medical care."  Motion at 15.  Further, the Jail Defendants argue, "the fact that the [procedural due-process] claim is analyzed under that framework necessarily precludes his substantive due process claim," because, "[w]here a plaintiff has recourse to an explicit textual source of constitutional protection, a more general claim of substantive due process is not available."  Motion at 15 (quoting Shrum v. City of Coweta, Okla., 449 F.3d 1132, 1145 (10th Cir. 2006)).

With respect to the ADA claim, the Jail Defendants argue that "claims for the failure to provide medical care are not actionable under the ADA."  Motion at 17.  Finally, they contend that there is no separate claim for liability under Monell, so Count IV fails to state a claim.  See Motion at 18.  They explain that "Monell extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  Motion at 18.  They argue, however, that because "Monell is not a separate cause of action," A. Romero "may attempt to use the Monell theory, of illustrating official policy acts of the public body, to attach liability to his § 1983 claims, but he may not plead a separate cause of action for Monell style official policy liability."  Motion at 19.  Accordingly, the Jail Defendants assert, "any available claim has been stated in Count I or II."  Motion at 20.

2.      **The Response**.

M. Romero responded on May 24, 2016.  See Plaintiff's Response to Jail Defendants' Motion for Judgment on the Pleadings, filed May 24, 2016 (Doc. 100)("Response").  Regarding her procedural due-process claim, she contends that the Amended Complaint makes clear that "the most disturbing allegations occur when Defendant Sandoval had responsibility over the

facility." Response at 12. She clarifies that M. Romero does not allege "that Defendant Lucero had the authority or power to provide classification reviews or give Plaintiff any procedural due process of law"; instead, "Plaintiff has alleged the responsibilities for procedural due process rest with the administrators of the facility, Wardens Billy and Sandoval."[5] Response at 11-12. She then explains that Tenth Circuit case law clearly establishes that, when the conditions of confinement are excessive in relation to their purpose, there is a procedural due process right at stake. See Littlefield v. Deland, 641 F.2d 729, 730 (10th Cir. 1981). She argues that the Amended Complaint adequately asserts how A. Romero's conditions of confinement were punitive, thereby violating his procedural due process rights. See Response at 6-10.

Regarding the substantive due-process claims, M. Romero contends that the Motion fails to "reference [] the case law governing the constitutional principles behind inhumane conditions of confinement and inadequate medical care." Response at 14. M. Romero explains that, in "the context of a pretrial detainee in a jail, the Fourteenth Amendment applies" rather than, as the Defendants contend, the Eighth Amendment. Response at 14. She contends that the Jail Defendants deliberately disregarded A. Romero's substantial medical need. See Response at 16-17. Finally, she asserts that the procedural due-process claim does not preclude the substantive due-process claim, noting that the claims use different facts and mention different Defendants. See Response at 18.

In defense of her ADA claim, M. Romero states that she plausibly alleges the elements of a Title II claim under Tenth Circuit law. See Response at 20-21 (citing Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1193 (10th Cir. 2007)). She explains that the Defendants excluded A. Romero from participating in the Curry Detention Center's "typical programming

---

[5]Billy does not join the Jail Defendants' Motion.

and recreational facilities," including "group therapy, commissary and visitation."  Response at 21.  She argues that, if the "Defendants concede Plaintiff, in his complaint, has alleged a denial of visitation, recreation, commissary, group therapy, and religious services, then presumably they would have to concede the ADA claim remains tenable."  Response at 21.  Finally, M. Romero observes that the Jail Defendants do "not dispute the existence of the potential for *Monell* liability for the procedural or substantive due process claims made in this case."  Response at 22.  She contends that the Defendants argue only that the <u>Monell</u> claim should not be labeled as a new count.  <u>See</u> Response at 22-23.  M. Romero asserts that this claim plausibly alleges that the "custom and policy of isolating the mentally ill was the moving force behind the violation of Plaintiff's procedural and substantive due process rights."  Response at 23.

### 3.     The Reply.

The Jail Defendants replied on June 16, 2016.  <u>See</u> Defendants' Reply in Support of Their Motion for Judgment on the Pleadings, filed June 16, 2016 (Doc. 104)("Reply").  They appear to concede that the Fourteenth Amendment -- not the Eighth Amendment as they alleged in the Motion -- may provide constitutional protection for M. Romero's substantive due process allegations.  <u>See</u> Reply at 1-2.  They maintain, however, that the Tenth Circuit has not discussed "which prong of the 'Due Process Clause' applie[s]."  Reply at 2.  They therefore contend that M. Romero must seek relief through procedural due process, because it "provides an explicit textual source of constitutional protection."  Reply at 2.

With respect to the ADA claim, the Jail Defendants argue that the ADA claim is "based on the lack of medical care," but that there is no basis for that claim under the ADA.  Reply at 4.  They appear to recognize that an ADA claim could be based on the exclusion from "group therapy, commissary, and visitation," but state that the Amended Complaint "makes only passing formulaic mention of those assertions."   Reply at 4.   They emphasize that, because these

assertions are only formulaic, the Court should not consider, as part of the ADA claim, the allegations that the Jail Defendants excluded A. Romero from certain services.  See Reply at 4-6. Finally, the Jail Defendants argue that Sandoval's and Lucero's actions "do not form the basis of any due process complaint, more less a conscious shocking substantive due process claim." Reply at 7.

### 4.    The Hearing.

The Court held a hearing on August 8, 2016.  See Transcript of Hearing (taken August 8, 2016)("Tr.").[6]  The parties argued each of the claims in turn.  First, they discussed whether the other claims precluded the substantive due-process claim.  See Tr. at 3:16-13:25 (Court, Coyte, Huss).  The Jail Defendants argued that M. Romero's claims are "either procedural due process by the nature of the allegations . . . or they're alleged conscience-shocking violations brought under the substantive due process claim."  Tr. at 3:16-20 (Huss).  They asserted that, if M. Romero alleges a procedural due-process claim because A. Romero was "subjected to punishing or atypical conditions without appropriate process," then the procedural due-process claim "precludes his substantive due process claims."  Tr. at 5:9-16 (Huss).  They recognized, however, that courts address "conditions of confinement claims under the substantive due process wing."  Tr. at 5:17-20 (Huss).

M. Romero observed that "defendant Billy is the one who failed as the complaint said to perform any classification review or provide Mr. Romero any process at all," and he "has not joined this motion."  Tr. at 11:14-22 (Coyte).  She argued that Billy deprived A. Romero of that initial classification review, and Sandoval deprived him of any interim review, thus depriving him of due process.  See Tr. at 12:8-17 (Coyte).  In contrast, M. Romero stated, the substantive

---

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

due-process claim "goes against other defendants and incorporates other factual allegations, including a lack of medical care that are factually distinct and separate."  Tr. at 12:17-22 (Coyte). Billy acknowledged that M. Romero plausibly states claims for both procedural and substantive due process, and that one claim does not preclude the other.  See Tr. at 30:22-31:8 (Autio, Court).

Regarding the procedural due-process claim in particular, the Court asked how the allegations failed to state a claim in light of the fact that the Amended Complaint alleges that Billy and Sandoval "failed to make these classifications with the requisite due process hearing"? Tr. at 17:15-24 (Court).  The Jail Defendants argued that the Amended Complaint fails to allege how Sandoval's personal actions deprived A. Romero of process when state law prevented her from transferring A. Romero out of the facility.  See Tr. at 19:1-12 (Huss).  M. Romero explained that Sandoval deprived A. Romero of process, because she knew of A. Romero's mental illness, yet failed to provide a classification review.  See Tr. at 20:2-21:6 (Coyte).

M. Romero stated that Sandoval violated A. Romero's substantive due process rights when she was deliberately indifferent to A. Romero's inhumane confinement conditions and did nothing to ensure better conditions.  See Tr. at 12:1-15:24 (Coyte).  The Jail Defendants maintained that M. Romero could not allege both a procedural and a substantive claim against Sandoval, but conceded that the Amended Complaint contained sufficient factual allegations to state a substantive due-process claim against her.  See Tr. at 30:5-13 (Court, Huss).  The Jail Defendants asserted that the "complaint pleads insufficient facts" about Lucero to state a substantive due-process claim against him.  Tr. at 29:8-16 (Huss).  M. Romero clarified that "Lucero was present throughout the entire time of the incarceration, he was a high ranking member of state, had personal day-to-day contact" with A. Romero.  Tr. at 32:10-15 (Coyte).

- 12 -

Moreover, she explained, the factual allegations demonstrate that "a high-ranking member of staff" who is participating in confining A. Romero in inhumane conditions "should do something about it.  And he has failed to do anything," revealing his deliberate indifference.  Tr. at 32:19-24 (Coyte).  The Jail Defendants conceded that, if a guard stood outside A. Romero's cell and was responsible for cleaning the cell -- thereby participating in the confinement -- a substantive due-process claim could proceed.  See Tr. at 43:1-15 (Court, Huss).

The parties then turned to the ADA claim.  See Tr. at 45:1 (Court).  The Jail Defendants argued that the Amended Complaint focuses on "the conditions of confinement as they related to that cell" and the "depriv[ation] of adequate medical care."  Tr. at 45:2-12 (Huss).  They argued that the "plaintiff throws in essentially a couple . . . conclusory allegations that he's also deprived of similar instances of prison life," but that these are conclusory allegations that the Court should disregard.  Tr. at 45:12-18 (Huss).  See id. at 46:8-10 (Huss)(noting that the Amended Complaint "says things like he was deprived of social interaction"); id. at 46:12-15 (conceding that the Amended Complaint contains "a couple" allegations "that may be protected by the ADA").

M. Romero agreed that "medical care from the case law isn't part of an ADA claim, but visitation in paragraph 129, group therapy, religious services, and recreation opportunities all be[ing] denied as a result of his mental illness" all form an ADA claim.  Tr. at 48:1-5 (Coyte).  She explained that "there's a whole list of case law that supports" that "not being out to exercise for months" violates the ADA.  Tr. at 48:8-14 (Coyte).  Moreover, she argued, the Jail Defendants cannot "argue that they didn't keep him in that cell because of his mental illness."  Tr. at 48:5-7 (Coyte).

Finally, the parties addressed the Monell claim.  See Tr. at 48:22-23 (Court).  The Jail Defendants argued that "Monell is merely one way of proving other constitutional claims, but

it's not a separate claim.  It's not a separate count."  Tr. at 49:1-4 (Huss).  The Court explained that many lawyers bring "substantive process, procedural due process . . . against the individuals," but "then as to the entities themselves that are often protected by the 11th Amendment, they often just have a separate Monell claim."  Tr. at 51:4-10 (Court).  The Court asked whether there was "any case law that says that's a wrong way to plead?"  Tr. at 51:11-12 (Court).  The Jail Defendants asserted that some district courts have stated that Monell claims are not separate claims, but noted that neither the Tenth Circuit nor the Supreme Court prohibits M. Romero's form of pleading.  See Tr. at 52:1-14 (Huss).

The Court then questioned whether the Jail Defendants contended that the Monell claim fails to state a claim, or lacks factual allegations that a policy and custom existed.  See Tr. at 52:15-19 (Court).  The Jail Defendants clarified that they argue only that the Monell claim should not be labeled as a separate count: "I'm not arguing an insufficiency of the allegations about policy.  He's got those in there for sure.  What I'm arguing is that you don't get to take your one claim and multiply it into three or four claims."  Tr. at 52:20-25 (Huss).  M. Romero asserted that she wrote the Monell claim as a separate count "for ease and simplicity," and "to give them notice."  Tr. at 53:19-23 (Coyte).

M. Romero then addressed the factual issues in the case one more time.  See Tr. at 57:17-25 (Coyte).  She explained that, hypothetically, if a prison guard stood outside of A. Romero's jail cell, "smelling the odors and being there," knowing what is happening,

> that individual is responsible.  The Nuremberg trials taught us that, if anything.  You don't -- even if you passively engage in this behavior, humanity requires us to do more.  And he can quit his job, he can yell from the tree tops, but he can't continue to stand in front of that door and do nothing.  Humanity expects us to do better than that, and we've learned that from those trials back in [the] 1940s.

Tr. at 57:17-58:3 (Coyte).

- 14 -

## LAW REGARDING RULE 12(c)

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties.  See Kruzitis v. Okuma Mach. Tool, Inc., 40 F.3d 52, 54 (3d Cir. 1994)("Under Rule 12(c), we will not grant judgment on the pleadings unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.")(internal quotation marks omitted).  A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"  Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d 1239, 1244 (10th Cir. 2006)(citing United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).  "Any party may move for judgment on the pleadings if no material facts are in dispute and the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice."  Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. 303, 304 (D.N.M. 2000)(citing Fed. R. Civ. P. 12(c)).

A motion pursuant to rule 12(c) is generally treated in the same manner as a motion to dismiss under rule 12(b)(6).  See Brown v. Montoya, 662 F.3d 1152, 1160 (10th Cir. 2011); Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304 (citing Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638 (2d Cir. 1998)).  The court will grant a motion for judgment on the pleadings if the pleadings demonstrate that the moving party is entitled to judgment as a matter of law.  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304.  A court considering a motion for judgment on the pleadings should "accept all facts pleaded by the non-moving party as true

and grant all reasonable inferences from the pleadings in favor of the same." Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d at 1244. The court must view the facts presented in the pleadings and draw the inferences therefrom in the light most favorable to the nonmoving party. See Dias v. City & Cty. of Denver, 567 F.3d 1169, 1178 (10th Cir. 2009); Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304. All of the nonmoving party's allegations are deemed to be true, and all of the movant's contrary assertions are taken to be false. See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945); Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

The same standards that govern a motion to dismiss under rule 12(b)(6) also govern a motion for judgment on the pleadings under rule 12(c). See Atl. Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1160 (10th Cir. 2000). Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  See Brown v. Montoya, 662 F.3d at 1163 (stating that the "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully"). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The United States Court of Appeals for the Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).   Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 818).   When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged that: (i) the defendant's actions violated his or her constitutional or statutory rights; and (ii) the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes

would understand that what he did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In determining whether the plaintiff has met his or her burden, the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378 (2007).  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  See Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court of the United States has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted in Pearson v. Callahan

that, while no longer mandatory, the protocol outlined in <u>Saucier v. Katz</u> would often be beneficial.  <u>See</u> 555 U.S. at 241.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified-immunity defense generally fails.  <u>See</u> <u>Cannon v. City & Cty. of Denver</u>, 998 F.2d 867, 870-71 (10th Cir. 1993).

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  <u>See</u> <u>Reid v. Paulter</u>, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." <u>Chavez-Rodriguez v. City of Santa Fe</u>, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights were violated: (i) "Did the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?"  <u>Camuglia v. City of Albuquerque</u>, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting <u>Clark v. City of Draper</u>, 168 F.3d 1185, 1189 (10th Cir. 1999)(internal quotation marks omitted)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake."  <u>Bd. of Regents of State Colls. v.</u>

Roth, 408 U.S. at 570-71.  "'Liberty' and 'property' are broad and majestic terms.  They are among the '(g)reat (constitutional) concepts . . purposely left to gather meaning from experience."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571.  The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Regarding the meaning of the "liberty" guaranteed by the Fourteenth Amendment, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572 (citations omitted).

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

- 21 -

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 (1970). See Flemming v. Nestor, 363 U.S. 603, 611 (1960). Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 (1956), and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 (1952), have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-66.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (citation omitted). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted)(citations omitted)(internal quotation marks omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.").

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)("DeShaney")).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney, 489 U.S. at 195.  In other words, the Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney, 489 U.S. at 195.

### 1.    Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- "exists when the state assumes control over an individual

- 24 -

sufficient to trigger an affirmative duty to provide protection to that individual." Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003)(quoting Armijo v. Wagon Mound Public Schools, 159 F.3d 1253, 1260 (10th Cir. 1998)).   See Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d at 994-95.   The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).   "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"   Glover v. Gartman, 899 F. Supp. 2d at 1135 (citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.   **The Special-Relationship Doctrine.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine.   A plaintiff must show: (i) that the state has restrained his or her "freedom to act to protect himself or herself through a restraint on that individual's personal liberty"; and (ii) that the restraint was involuntary.   Christiansen v. City of Tulsa, 332 F.3d at 1280 (quoting Armijo v. Wagon Mound Public Schools, 159 F.3d at 1261).   See A.M. ex rel. Youngers v. N.M. Dep't of Health, 65 F. Supp. 3d 1206 (D.N.M. 2014)(Browning, J.)("[T]he Tenth Circuit has concluded that whether an individual is involuntarily committed to the state -- and is, therefore, entitled to substantive due-process protections -- 'turn[s] on the dependent and involuntary nature of the custodial relationship.'")(quoting Schwartz v. Booker, 702 F.3d 573, 580 (10th Cir. 2012)). "Absent involuntary restraint, however, no duty to protect arises under the special-relationship

theory." Christiansen v. City of Tulsa, 332 F.3d at 1280. See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996)(finding no special relationship existed in a consensual employment relationship); Uhlrig v. Harder, 64 F.3d at 572 ("A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual . . . ."). Notably, the State must impose the limitation on the individual's freedom. See Christiansen v. City of Tulsa, 332 F.3d at 1280. Mere knowledge of the individual's predicament is insufficient. See Christiansen v. City of Tulsa, 332 F.3d at 1280 (noting that the State's "affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf").

The Tenth Circuit does not determine whether the special-relationship doctrine applies using only formalistic distinctions. See Maldonado v. Josey, 975 F.2d 727 (10th Cir. 1992). It analyzes the nature and effect of the restraint on the individual's freedom. See Christiansen v. City of Tulsa, 332 F.3d at 1280 (concluding that the police had no special relationship with a quarantined individual, not because the police had not taken the individual into custody, but because the policy had not sufficiently restrained the individual's freedom to leave the area or make calls). Accordingly, whether an individual is in "custody" is not sufficient to determine whether the restraint on the individual rises to such a level that it creates a special relationship with the state.[7] See Maldonado v. Josey, 975 F.2d at 732-33 (noting that the special relationship does not apply to school officials, even though they may have "custody" of the children during school hours). Instead, the restraint must restrict an individual's liberty to such a degree that it

---

[7]Although a custodial relationship may not be sufficient to determine whether a special relationship exists, it is necessary. See Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 923 n.10 (10th Cir. 2012)("By definition, the special relationship theory necessarily only applies where a 'custodial relationship' exists between the victim and the State.").

makes the individual involuntarily dependent upon the state to meet the individual's basic needs. See Maldonado v. Josey, 975 F.2d at 732-33.   Accordingly, "[a]lthough a child may well be in the 'custody' of the school authorities during school hours, this custody does not amount to a restraint that prohibits the child and his parents from caring for the basic needs of the child." Maldonado v. Josey, 975 F.2d at 732-33.   In contrast, when a foster child is in the state's custody, the child depends on the state to meet his or her basic needs.   See Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d at 885; Maldonado v. Josey, 975 F.2d at 732-33 (noting that children in foster homes "depend completely on the state to satisfy their basic human needs").

### 3.        The Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."   Uhlrig v. Harder, 64 F.3d at 573.   The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."   Currier v. Doran, 242 F.3d at 923.   See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012) ("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."); Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)("'[I]naction by the state in the face of a known danger is not enough to trigger the obligation' unless the State has 'limited in some way the liberty of a citizen to act on his own behalf.'").   Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."[8]   Uhlrig v. Harder, 64 F.3d at 573.

---

[8]The Tenth Circuit explained that the "latter form of intent is frequently referred to as 'reckless' conduct."   Uhlrig v. Harder, 64 F.3d at 573 n.8.   It differs from gross negligence because, in reckless conduct, "the defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff." Uhlrig v. Harder, 64 F.3d at 573 n.8.

A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d at 916).

To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased the plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) the defendant must have acted recklessly in conscious disregard of that risk; and (vi) the defendant's actions shock the conscience.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).  Additionally, a plaintiff "must allege a sufficient *causal link* between the danger created by an affirmative act of the State and the harm inflicted upon the victim by a private party."  Gray v. Univ. Colo. Hosp. Auth., 672 F.3d at 917 (emphasis in original).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992), overruled on other grounds by Morris v. Noe, 672 F.3d 1185 (10th Cir. 2012).  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and

unreasonable disregard of the consequences."   Medina v. City & Cty. of Denver, 960 F.2d at 1496.

    4.    **What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.   See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").   "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."   Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006))(internal quotation marks omitted).   "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."   Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574)(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge."   Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient

facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.  See 265 F.3d at 1132.  The district court found that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience."   265 F.3d at 1134.   The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[9] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

---

[9]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations omitted) (internal quotation marks omitted).

Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING TITLE II OF THE ADA

Title II of the ADA, 42 U.S.C. §§ 12131-12165, commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   The Tenth Circuit requires that a plaintiff prove three factors to establish a claim under Title II: (i) that he or she is a qualified individual with a disability; (ii) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or the public entity otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  See Gohier v. Enright, 186 F.3d 1216, 1219 (10th Cir. 1999)(explaining that this general standard, which tracks the statute's language, is "plainly correct").   "Although a plaintiff may claim intentional discrimination, the Tenth

Circuit has not yet articulated the essential elements of a claim of intentional discrimination under Title II of the ADA or detailed what a plaintiff must plead at a minimum to establish such a claim." Braverman v. New Mexico, No. CIV 11-0829 JB/WDS, 2012 WL 5378290, at * 22 (D.N.M. Sept. 26, 2012)(Browning, J.)(citing Tyler v. City of Manhattan, 118 F.3d 1400, 1405 (10th Cir. 1997)(Jenkins, J., dissenting), and Young v. City of Claremore, Okla., 411 F. Supp. 2d 1295, 1314 (N.D. Okla. 2005)).

"Title II of the ADA does not provide for individual capacity suits against state officials." Braverman v. New Mexico, 2011 WL 6013587, at *22 (D.N.M. Oct. 19, 2011)(Browning, J.)("Title II's plain language would therefore suggest that official may not be sued in their individual capacity."). See J.H. ex rel. J.P. v. Bernalillo Cty., 2014 WL 3421037, at *99 (D.N.M. July 8, 2014)(Browning, J.)(stating that no claim against an official in his individual capacity exists under Title II of the ADA), aff'd on other grounds, 806 F.3d 1255 (10th Cir. 2015). The Tenth Circuit has also held that "the ADA precludes personal capacity suits against individuals who do not otherwise qualify as employers under the statutory definition." Butler v. City of Prairie Village, Kan., 172 F.3d at 744. Several other United States Courts of Appeal have held that the ADA "does not provide for individual liability, only for employer liability." Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996).

The United States Court of Appeals for the Eleventh Circuit has stated that "there is no individual capacity liability under Title II of the ADA." Badillo v. Thorpe, 158 F. App'x 208, 211 (11th Cir. 2005). The United States Court of Appeals for the Seventh Circuit has "rule[d] directly that only the employer, not individual employees, can be liable" under the ADA. EEOC v. AIC Sec. Inv., 55 F.3d 1276, 1279-82 (7th Cir. 1995). See Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)("The relief granted under Title VII [of the Civil Rights Act, 42 U.S.C.

§ 2000e(b), which defines 'employer' in the same way as the ADA,] is against the *employer*, not individual employees whose actions would constitute a violation of the Act.")(emphasis in original).  The United States Courts of Appeals for the Second, Sixth, and Eighth Circuits have also agreed that plaintiffs cannot maintain ADA suits against officials in their individual capacities.  See Carten v. Kent State Univ., 282 F.3d 391, 396-97 (6th Cir. 2002)(holding that a defendant must be held responsible in "his or her official capacity for violating Title II, which by its terms applies only to 'public entit[ies]'"); Garcia v. SUNY Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001)("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999)("[T]he commissioners may not be sued in their individual capacities directly under the provisions of Title II. Title II provides disabled individuals redress for discrimination by a 'public entity.'"); Shabazz v. Texas Youth Comm'n, 300 F. Supp. 2d 467, 473 (N.D. Tex. 2003)(Lynn, J.)("The Court holds that Plaintiff is precluded from bringing an action under the ADA, just as he is under Title VII, against a person acting for an employer.").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[10] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

---

[10]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

1.      **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's

use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2. __Individual Liability.__

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.

The recovery should be guided by common-law tort principles -- including principles of causation . . . ."   Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.   Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.   See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.   Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process

> injures him.  Is the third officer necessarily liable for the harm caused to the
> suspect on the theory that the illegal entry without knocking and announcing
> rendered any subsequent use of force unlawful?  The obvious answer is "no." The
> suspect's conduct would constitute a "superseding" cause, <u>see</u> Restatement
> (Second) of Torts § 442 (1965), that would limit the officer's liability. <u>See</u> <u>id.</u>
> § 440.

<u>Trask v. Franco</u>, 446 F.3d at 1046 (quoting <u>Bodine v. Warwick</u>, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  <u>Trask v. Franco</u>, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., <u>Prosser and Keeton on Torts</u> § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for
> reasonable difference of opinion as to whether such act was wrongful or
> foreseeable, the question should be left for the jury.

<u>Trask v. Franco</u>, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b

(1965)).

### 3.  <u>Supervisory Liability</u>.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless

there is "'an affirmative link . . . between the constitutional deprivation and either the

supervisor's personal participation, . . . exercise of control or direction, or . . . failure to

supervise.'"  <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting <u>Green v.</u>

<u>Branson</u>, 108 F.3d 1296, 1302 (10th Cir. 1997)(internal alterations omitted)).  Because

supervisors can be held liable only for their own constitutional or illegal policies, and not for the

torts that their employees commit, supervisory liability requires a showing that such policies

were a "deliberate or conscious choice."  <u>Barney v. Pulsipher</u>, 143 F.3d at 1307-08 (citations

omitted)(internal quotation marks omitted).  <u>Cf.</u> <u>Bd. of Cty. Comm'rs v. Brown</u>, 520 U.S. at 404

("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the

municipality.   The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.   <u>See</u> <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *25-26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   <u>Ashcroft v. Iqbal</u>, 556 U.S. at 676.   The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.   The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."   <u>Dodds v. Richardson</u>, 614 F.3d at 1200.   It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."   <u>Dodds v. Richardson</u>, 614 F.3d at 1200.   The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the

complained of constitutional harm, and (3) acted with the state of mind required
to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995,

1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these

are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200

n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the

Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the

third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal
> law, or directs an employee to do so, resolving these issues of fault and causation
> is straightforward.   Section 1983 itself contains no state-of-mind requirement
> independent of that necessary to state a violation of the underlying federal right.
> In any § 1983 suit, however, the plaintiff must establish the state of mind required
> to prove the underlying violation.   Accordingly,  proof that a municipality's
> legislative body or authorized decisionmaker has intentionally deprived a plaintiff
> of a federally protected right necessarily establishes that the municipality acted
> culpably.   Similarly, the conclusion that the action taken or directed by the
> municipality or its authorized decisionmaker itself violates federal law will also
> determine that the municipal action was the moving force behind the injury of
> which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. at

404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same

logic applies when the plaintiff sues a defendant-supervisor who promulgated, created,

implemented or possessed responsibility for the continued operation of a policy that itself

violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit

reduced the test to what can be seen as a two-part test for supervisor liability, requiring the

plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their

subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing

their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01

(quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

- 40 -

4.    **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## ANALYSIS

M. Romero adequately alleges a procedural due-process claim by asserting that the Defendants confined A. Romero in punishing conditions that were excessive in relation to any legitimate governmental interest without providing any hearings or reviews.  Second, because the procedural due-process claim asserts a different injury against different Defendants than the substantive due-process claim, the substantive due-process claim is not precluded.   Third, although M. Romero alleges some factual allegations that do not constitute an ADA violation, she alleges other factual allegations which, if true, state an ADA claim.  Finally, although the Monell claim is not an independent, free-standing claim, the Defendants have not pointed to any law from the Tenth Circuit that precludes plaintiffs from pleading it as a separate count for clarity.  Accordingly, the Court denies the Motion.

I.   **M. ROMERO PLAUSIBLY STATES A CLAIM FOR VIOLATION OF PROCEDURAL DUE PROCESS, SO THE COURT WILL NOT DISMISS THE CLAIM.**

The Jail Defendants contend that the Court should dismiss the procedural due-process claim for three main reasons.  See Motion at 6.  First, they argue that the Amended Complaint

does not adequately allege the elements necessary to state a due process claim, because it does not allege that the Jail Defendants intended to punish A. Romero.  See Motion at 9-12.  Second, they assert that "the individual capacity defendants are entitled to qualified immunity because the right claimed by the plaintiff is not a clearly established right."  Motion at 13.  Third, they argue that the Amended Complaint does not establish that Sandoval or Lucero participated in the due process violation.  See Motion at 6-9.

## A.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES A PROCEDURAL DUE-PROCESS CLAIM.

M. Romero plausibly alleges that the Jail Defendants violated A. Romero's clearly established liberty interest.  The "constitutionality under a due process analysis of the nature or duration of pretrial detention turns on whether such detention amounts to 'punishment' in the constitutional sense."  Littlefield v. Deland, 641 F.2d 729, 731 (10th Cir. 1981)("Littlefield").  If the prison officials did not express "an intent to punish the pretrial detainee," the Court must examine whether the pretrial detention condition is excessive in relation to a legitimate governmental purpose and "in fact constitutes punishment whatever its asserted purposes may be."  Littlefield, 641 F.2d at 731 (holding that a detainee's segregation without a hearing violated due process and constituted punishment, even though the district court found "no clear evidence of an expressed intent by facility officials to punish plaintiff").  The Tenth Circuit has stated that "[d]etention conditions that fail to meet minimal health and safety needs of the prisoners cannot be reasonably related to a legitimate governmental goal."  Robinson v. Corriveau, 72 F.3d 138 (10th Cir. 1995)(unpublished).

Holding a prisoner in certain conditions may violate the Due Process Clause if the prisoner is subjected to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).  For instance, in Fogle v.

Pierson, 435 F.3d 1252 (10th Cir. 2006), the Tenth Circuit held that the district court "abused its discretion" in concluding that a three-year period of administrative segregation -- "during which time [the defendant] was confined to his cell for all but five hours each week and denied access to any outdoor recreation -- is not 'atypical.'"   435 F.3d at 1259.   Similarly, in Gaines v. Stenseng, 292 F.3d 1222 (10th Cir. 2002), the Tenth Circuit ruled that, without "carefully examin[ing] the conditions of confinement of the prisoner's confinement," it was error to find that a seventy-five-day disciplinary segregation was not atypical.   292 F.3d at 1225-26.

In determining whether segregation is "atypical," the Tenth Circuit considers: (i) the duration of the confinement and whether it increases the inmate's overall confinement duration; (ii) whether the placement in segregation is indeterminate; (iii) the frequency with which the segregation placement is reviewed; (iv) the penological interest that segregation furthered, "such as safety or rehabilitation;" and (v) whether the "conditions of placement are extreme."   Estate of DiMarco v. Wyo. Dep't of Corr., 473 F.3d 1334, 1342 (10th Cir. 2007).   See Wilkenson v. Austin, 545 U.S. 209, 224 (2005).   In Estate of DiMarco v. Wyoming Department of Corrections, the Tenth Circuit found that the conditions were not atypical when Wyoming placed the plaintiff in administrative segregation: (i) to protect the plaintiff -- a transsexual -- from other inmates; (ii) because it lacked adequate facilities for transsexual inmates; (iii) she had "access to the basic essentials of life," had clean clothing, ate the same meals as the general population, had access to the library, recreational, and religious facilities, participated in out-of-cell time at least five-and-one-half hours each day, was give personal hygiene items, participated in group counseling sessions and psychiatric sessions, and met with a caseworker regularly to discuss her conditions and placement; (iv) her segregation placement did not increase her sentence; and (v) her placement "was reviewed every ninety days" and she "had regular reevaluations throughout

her confinement," which included behavioral and mental health progress monitoring, and interviews where she was "allowed to present her views."  473 F.3d at 1343-44.

The Jail Defendants argue that it does not violate due process to place a detainee "into short-term segregation [when] there's no other condition to go with it."  Tr. at 9:20-23 (Huss). They cite Peoples v. CCA Detention Centers, 422 F.3d 1090 (10th Cir. 2005), where the Tenth Circuit held that placing a pretrial detainee in segregation for administrative purposes without an initial hearing does not violate the Constitution.  See 422 F.3d at 1106.  There, the prison temporarily placed the prisoner -- Peoples -- in segregation, because there were not enough vacant cells, but it kept him in segregation when it discovered the prisoner's plot to escape from a previous facility and labeled him "an escape risk."  422 F.3d at 1094.  See id. at 1106 ("A substantiated escape threat, as is found here, is a legitimate nonpunitive rationale for Mr. People's continued segregation.").  Moreover, Peoples did not identify any other conditions of segregation that made his confinement atypical or especially injurious.  Peoples could "obtain legal materials" and "various resources," and could make telephone calls.  422 F.3d at 1094. Accordingly, the Tenth Circuit concluded that the prisoner's conditions were "in furtherance of legitimate penal objectives."  422 F.3d at 1107.

Here, however, A. Romero endured numerous other serious conditions that imposed a significant hardship on him.  First, A. Romero was unable to participate in any of the jail's programming services.  Unlike other inmates, A. Romero was not given access to "recreation, visitation, use of the phone, mail, programming services such as group therapy and religious activities, and commissary."  Amended Complaint ¶ 97, at 10.  He had no access to the "ordinary services provided to inmates in the jail."  Amended Complaint ¶ 99, at 11.  He was not allowed to leave his cell or go outside.  See Amended Complaint ¶¶ 89, 112, at 10, 12.  Second, the

conditions inside of his cell were disgusting.  He was reduced to sleeping on the concrete floor or on a "steel bed frame with no mattress."  Amended Complaint ¶¶ 87-88, at 9-10.  His "cell was littered with torn paper, food, and other items."  Amended Complaint ¶ 88, at 9-10.  It smelled "foul" and was repeatedly covered in feces and urine.  Amended Complaint ¶¶ 48-49, 112, at 6, 12.  Finally, he was not given adequate mental or physical healthcare.  "The segregation watch logs . . . indicate a complete lack of mental healthcare as he was not visited by anyone at all material times."  Amended Complaint ¶ 82, at 9.  A. Romero's medical files note that his skin was "open and cracking."  Amended Complaint ¶ 86, at 9.  Overall, M. Romero alleges that A. Romero's conditions reached the point they were "inhumane" and amounted to "punishment of a pre-trial detainee."  Amended Complaint ¶¶ 90, 93, at 10.  These conditions persisted for eight months.  See Amended Complaint ¶ 120, at 12.  In sum, the Amended Complaint adequately alleges that these conditions were "excessive in relation to the alternative purpose assigned" -- maintaining jail security -- and they "amount[] to punishment."  Littlefield, 641 F.2d at 731.

Further, on the facts as alleged, A. Romero was not given any initial classification review, or any subsequent reviews.  See Amended Complaint ¶¶ 117-118, at 12 (alleging that the Curry Detention Center did not complete an initial classification assessment form and "then failed to have any classification review thereafter").  Cf. Estate of DiMarco v. Wyo. Dep't of Corr., 473 F.3d at 1344-45 (observing that the plaintiff "was aware of and agreed to" administrative segregation, was given "periodic and meaningful reviews of her status, including meetings" that the plaintiff could attend, and "signed the classification form . . . indicating that she had reviewed the form and the reasons for the custody level had been explained").  "Prison officials must engage in some sort of periodic review of the confinement" of prisoners in segregation.  Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983), abrogated in part on other grounds

by Sandin v. Conner, 515 U.S. at 483.  The review must be meaningful; it cannot be a sham or a pretext.  See Hewitt v. Helms, 459 U.S. at 460, 477 n.9.  See Sourbeer v. Robinson, 791 F.2d 1094, 1101 (3d Cir. 1986).  On these facts, where M. Romero alleges that A. Romero was "placed in solitary confinement without *any* review, and that during his time in the facility he received no periodic hearing, and no review of his classification," Response at 7-8 (emphasis in Response)(citing Amended Complaint ¶¶ 117-121, at 12-13), M. Romero plausibly alleges a due process violation.

The Jail Defendants contend that M. Romero fails to allege that the Jail Defendants intended to punish A. Romero by placing him in solitary confinement, although they appear to have abandoned this argument at the hearing.  See Motion at 10; Tr. at 4:11-21 (Huss)(describing how the Amended Complaint "alleges at paragraph 93 that Alex's condition of confinement amounted to punishment").  M. Romero sufficiently alleges that "Alex's conditions of confinement amounted to punishment."  Amended Complaint ¶ 93, at 10.  See Amended Complaint ¶ 116, at 12 (stating that the conditions "amounted to punishment of a pretrial detainee").  Although the Jail Defendants argue that they placed A. Romero in solitary confinement because of his violent temperament, M. Romero plausibly alleges that the Jail Defendants placed him in solitary confinement for punitive reasons solely related to his mental illness irrespective of the symptoms that might be violent.  The Amended Complaint alleges that the conditions were "inhumane," amounted to "punishment of a pre-trial detainee," and were excessive in relation to any legitimate governmental goal.  Amended Complaint ¶¶ 93, 116, at 10, 12.  The Amended Complaint states a procedural due process violation.

**B.    THE LAW WAS CLEARLY ESTABLISHED, SO THE COURT DENIES THE QUALIFIED IMMUNITY DEFENSE.**

In 1981 the Tenth Circuit held that, when the conditions of confinement are excessive in relation to their purpose, there is a procedural due process right at stake.  See Littlefield, 641 F.2d at 730.  There, the prisoner -- Littlefield -- was "a young man suffering from mental illness," who "was arrested and charged with disorderly conduct."  641 F.2d at 730.  Littlefield was housed in a solitary cell used "to segregate prisoners with severe mental disorders" with no windows, no bunk, and no floor covering for fifty-six days.  641 F.2d at 730.  The toilet "was flushed irregularly from outside the cell."  641 F.2d at 730.  Littlefield "slept naked on the concrete floor" and "was given no opportunity to engage in any recreation outside his cell," nor "permitted to have any reading or writing materials."  641 F.2d at 730.  His "cell frequently stank of feces and urine."  641 F.2d at 730.  He was held there "without notice or opportunity to be heard with respect to the nature or duration of his confinement."  641 F.2d at 730.  Although the "district court found no clear evidence of an expressed intent by facility officials to punish plaintiff," the Tenth Circuit affirmed the judgment "that plaintiff's confinement amounted to punishment and therefore that the county's failure to provide plaintiff with any meaningful notice and hearing violated the due process clause."  641 F.2d at 731.

Accordingly, even if there is no overt intent to punish, a procedural due process violation can still arise if the conditions are "excessive in relation to the alternative purpose assigned" and they "amount[] to punishment."  Littlefield, 641 F.2d at 731.  "[W]ithout any meaningful notice and hearing" Littlefield's procedural due process rights were violated.  Littlefield, 641 F.2d at 731.  Like Littlefield, A. Romero was also "a young man suffering from mental illness."  641 F.2d at 730.  Like Littlefield, A. Romero was held in segregation "without notice or opportunity to be heard with respect to the nature or duration of his confinement."  641 F.2d at 730.  The Jail

Defendants contend that a reasonable officer would not know that he or she had to give any procedure to a mentally ill prisoner, but Littlefield rebuffs that contention.  A. Romero also had no windows, no floor covering, and no mattress on which to sleep, causing him to sleep on the steel bed frame or the floor.  See Amended Complaint ¶ 45, at 5; Littlefield, 641 F.2d at 730. Further, like Littlefield, A. Romero was frequently naked in an isolated cell that smelled horrendous.  See Amended Complaint ¶¶ 104-107, at 11 (noting that A. Romero's "cell would only be cleaned when the smell became so bad the guards could not take it anymore," and that, to bathe A. Romero, the guards "sprayed [him] down with a water hose like a dog").  While in segregation for eight months, A. Romero was deprived not only of human contact, but also of the requisite medical care, including essential medications, group therapy, and other mental health care.  See Amended Complaint ¶ 97, at 10.

The Tenth Circuit decided Littlefield in 1981 -- long before the events at issue in this case occurred.  From reading Littlefield, a reasonable official would know that it violates due process to leave a mentally ill detainee in segregation for eight months without any classification review or periodic review: (i) in a filthy segregation cell that smelled foul; (ii) in which the detainee did not have regular access to personal hygiene items; (iii) where the detainee slept naked on the floor; (iv) where the detainee had no access to any prison programs, including recreation; and (v) where the detainee had no access to necessary mental health care.  M. Romero can plausibly show that, even if the Jail Defendants had a legitimate governmental reason for initially placing A. Romero in solitary confinement, the eventual conditions bore "no reasonable relationship" to the legitimate governmental objective of maintaining jail security.  Blackmon v. Sutton, 734 F.3d 1237 (10th Cir. 2013)(concluding that the defendants could not employ the qualified immunity defense when they used a restraint chair in an arguably punishing way).  M. Romero has

plausibly asserted that the Jail Defendants likewise used solitary confinement and other tactics in an arguably punishing way that precludes qualified immunity.   Clearly established law demonstrates that, "without any meaningful notice and hearing," the Jail Defendants could have violated A. Romero's procedural due process rights.  Littlefield, 641 F.2d at 731.

### C.   THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES SANDOVAL'S PARTICIPATION IN THE ALLEGED DUE PROCESS VIOLATION, BUT IT DOES NOT ALLEGE A CLAIM AGAINST LUCERO.

The Jail Defendants also ask the Court to dismiss the procedural due-process claim, because the Amended Complaint fails to allege how Lucero or Sandoval "personally participated" in the procedural due-process violation.  Motion at 7  With respect to Lucero, the Response clarifies that M. Romero does not allege "that Defendant Lucero had the authority or power to provide classification reviews or give Plaintiff any procedural due process of law"; instead, the "Plaintiff has alleged the responsibilities for procedural due process rest with the administrators of the facility, Wardens Billy and Sandoval."[11]  Response at 11-12.  See Tr. at 16:5-17 (Coyte)(stating that M. Romero "can only raise due process claims against someone responsible for providing process, which would be the warden," so "we have only Sandoval and Billy as the defendants on the procedural claim").

Regarding Sandoval, the Amended Complaint makes clear that "the most disturbing allegations occur when Defendant Sandoval had responsibility over the facility."  Response at 12.  For instance, the Amended Complaint asserts that jail documents reveal that A. Romero smeared his feces in his cell during Sandoval's tenure as warden, February 8 and 16, 2013.  See Amended Complaint ¶¶ 49-50, at 6.  The Amended Complaint also states that, even though

---

[11]Billy does not join the Jail Defendants' Motion and agrees that M. Romero has plausibly stated a due-process claim.  See Tr. at 30:22-31:8 (Autio, Court).

Sandoval did not initially place A. Romero in solitary confinement, she failed to provide a hearing or periodic classification review for four months.  See Amended Complaint ¶ 6, at 2; id. ¶¶ 118-121, at 12-13.  It asserts that she "continued to confine Alex in a segregation cell untreated after she took over as interim administrator" without providing classification reviews. Amended Complaint ¶¶ 78-79, at 8-9.  Accordingly, the Amended Complaint plausibly alleges Sandoval's participation in the procedural due-process violation.

The Jail Defendants ask the Court to dismiss the claims against Sandoval and Lucero in their individual capacity, because "only those claims truly attributed to defendant Sandoval in her individual capacity may illustrate an individual capacity claim against her."  Reply at 7 n.1. They argue that the allegations "are directed to the official capacity defendants."  Reply at 7. They appear to contend that they cannot be held personally liable for their actions taken at the Curry Detention Center, because they were truly acting in their official capacities.  The Supreme Court rejected this argument in 1991 in Hafer v. Melo, 502 U.S. 21, 26-27 (1991).  It clarified that "the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury."  Hafer v. Melo, 502 U.S. at 26.  Like the Jail Defendants do here, the defendant in Hafer v. Melo sought "to overcome the distinction between official- and personal-capacity suits by arguing that § 1983 liability turns not on the capacity in which state officials are sued, but on the capacity in which they acted when injuring the plaintiff."  502 U.S. at 27. Nevertheless, the Supreme Court emphasized that "[t]he requirement of action under color of state law means that Hafer may be liable for" the actions she took pursuant to "her authority as auditor general."  502 U.S. at 27-28.  The same rule applies here.  Sandoval and Lucero are not

"immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." Hafer v. Melo, 502 U.S. at 31.

## II.   THE PROCEDURAL DUE-PROCESS CLAIM DOES NOT PRECLUDE THE SUBSTANTIVE DUE-PROCESS CLAIM.

The Jail Defendants challenge the substantive due-process claim on two grounds. They first argue that Sandoval's and Lucero's actions "do not form the basis of any due process complaint, more less a conscious shocking substantive due process claim." Reply at 7. Next, they contend that the procedural due-process claim precludes the substantive due-process claim. See Motion at 15.

### A.   THE AMENDED COMPLAINT ASSERTS A SUBSTANTIVE DUE-PROCESS CLAIM.

When read in the light most favorable to M. Romero, the Amended Complaint sufficiently states a substantive due-process claim. In 1994, the Supreme Court held that the Eighth Amendment imposed a duty on prison officials to provide humane conditions of confinement and adequate medical care. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). These conditions include adequate food, clothing, shelter, and medical care, but also a more general requirement to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. at 832 (internal quotation marks and citation omitted). "Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, . . . the Eighth Amendment standard provides the benchmark for such claims." Craig v. Eberly, 164 F.3d 490 (10th Cir. 1998)(citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). See Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992)(stating that pretrial detainees "are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment"); Garcia v. Salt Lake Cty., 768 F.2d 303, 307

(10th Cir. 1985).  To make a substantive due-process claim for "conditions of confinement, a plaintiff must satisfy two requirements."  Craig v. Eberly, 164 F.3d at 495.

First, the alleged deprivation must be "sufficiently serious," which turns on the "severity of the alleged deprivations" and "their duration."  Craig v. Eberly, 164 F.3d at 495.  See Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998).  When a claim involves numerous alleged inhumane conditions, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise."  Wilson v. Seiter, 501 U.S. 294, 305 (1991).  M. Romero adequately alleges that A. Romero's conditions were "sufficiently serious" to deprive A. Romero of human needs like medical care and exercise.  A. Romero has a long history of serious and debilitating mental illness.  See Amended Complaint ¶¶ 22-23, at 3.  During the relevant time at the Curry Detention Center, he would spend hours on the floor under his metal bedframe naked while talking to himself.  See Amended Complaint ¶ 43, at 5.  Without receiving the care he needed, his condition deteriorated so much that he smeared his own feces throughout his cell on multiple occasions.  See Amended Complaint ¶¶ 48-49, at 6.  Other inmates recognized his obvious mental illness, describing him as "clearly out of his mind," and "hearing things and seeing things that were not there."  Amended Complaint ¶ 106, at 11.  A. Romero's treatment at the NMBHI confirmed these observations as he arrived disheveled with an overgrown beard and too incoherent to describe his time at the Curry Detention Center.  See Amended Complaint ¶¶ 57-60, at 6-7.  Furthermore, this medical need went unaddressed and was perhaps exacerbated when the Curry Detention Center denied A. Romero access to recreation, group therapy, and various other services.  See Amended Complaint ¶¶ 89, 97, at 10.  In conclusion, M. Romero sufficiently

alleges that A. Romero's conditions of confinement were sufficiently serious to deprive him of basic needs.

Second, to sufficiently allege the violation, M. Romero must show that the jail officials had a "sufficiently culpable state of mind." Craig v. Eberly, 164 F.3d at 495 (quoting Wilson v. Seiter, 501 U.S. at 305). In the context of prison-conditions claims, the required state of mind is one of "'deliberate indifference' to inmate health and safety." Craig v. Eberly, 164 F.3d at 495 (quoting Farmer v. Brennan, 511 U.S. at 834). The Court may conclude that the Defendants subjectively knew of a substantial risk of harm "from the very fact that the risk was obvious." Farmer v. Brennan, 511 U.S. at 842. Once again, M. Romero has alleged sufficient facts to state the claim. She asserts that jail records and medical files indicate that all of the Defendants were on notice of A. Romero's serious mental health condition. See Amended Complaint ¶165, at 17. The Amended Complaint goes further, however, in alleging that the Jail Defendants had personal knowledge. It states that Sandoval "admitted to the Clovis News Journal in April 2013 that the CCDC was not equipped to handle Alex or others like him." Amended Complaint ¶ 148, at 15. It states that Lucero had close personal contact with A. Romero, was aware that A. Romero was psychotic and required antipsychotic medication, and knew that A. Romero's psychoses caused him to refuse his medication, yet failed to obtain the care A. Romero needed. See Amended Complaint ¶ 80, at 9. The Jail Defendants acknowledge that Lucero had knowledge. See Tr. at 40:21-41:1 (Court, Huss).

It was clearly established when A. Romero was at the Curry Detention Center that being housed in inhumane conditions, being deprived of medical care, and being confined to a solitary cell without access to recreation for long periods of time violated A. Romero's constitutional rights. In 1999, the Tenth Circuit stated that a "total denial of exercise for an extended period of

time would constitute cruel and unusual punishment." Perkins v. Kan. Dep't of Corr., 165 F.3d 803 (10th Cir. 1999)(quoting Housley v. Dodson, 41 F.3d 597, 599 (10th Cir. 1994)).  Since 1976, the Supreme Court has held that "[p]rison officials violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of prisoners in their custody." Perkins v. Kan. Dep't of Corr., 165 F.3d 803 (10th Cir. 1999)(citing Estelle v. Gamble, 429 U.S. 97, 104-06 (1976)).  "[B]y 1997 it was clearly established law that the deliberate disregard of a patient's psychological needs can violate a detainee's constitutional rights no less than the deliberate disregard of his physical needs."  Blackmon v. Sutton, 734 F.3d at 1245.  Moreover, although the Jail Defendants contend that they could not have provided adequate medical care as they are not medical professionals, Tenth Circuit law has clearly established since 1997 that "prison officials who assume 'gate keeping' authority over prisoner access to medical professionals" can violate the Eighth Amendment.  Blackmon v. Sutton, 734 F.3d at 1245 (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)).  M. Romero alleges that the Jail Defendants had the ability to obtain the care that A. Romero needed.  See Tr. at 18:11-20 (Coyte)(explaining that, by writing a letter, Lucero was ultimately able to procure the medical care that A. Romero needed).  Although the facts at trial may not ultimately prove that Lucero could do anything for A. Romero, at this stage in the proceedings, the Court must take M. Romero's allegations as true.  See Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  In sum, a reasonable official would have known that depriving a detainee of exercise for an extended period of time, failing to provide him with the requisite medical care, and leaving him in inhumane conditions violates that detainee's constitutional rights.  Accordingly, on these allegations, M. Romero adequately states a substantive due-process claim, and qualified immunity is denied.

### B.   THE PROCEDURAL DUE-PROCESS CLAIM DOES NOT PRECLUDE THE SUBSTANTIVE DUE-PROCESS CLAIM.

The Jail Defendants argue that M. Romero's procedural due-process claim "precludes" the substantive due-process claim.  Motion at 15.  They do not cite any authority suggesting that procedural and substantive due-process claims are mutually exclusive on the facts presented. They cite a Sixth Circuit case, which dismissed a prisoner's substantive due-process claim for failure to provide adequate medical care where the Eighth Amendment provided the proper textual source of recourse.  See O'Brien v. Mich. Dep't of Corr., 592 F. App'x 338 (6th Cir. 2014)(unpublished).  As explained above, however, the Eighth Amendment is the proper avenue to sue for allegations of deliberate indifference to a serious medication condition in the prisoner context.   In the context of pretrial detainees, "the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement."  Craig v. Eberly, 164 F.3d 490 (10th Cir. 1998).  Accordingly, O'Brien v. Michigan Department of Corrections does not stand for the proposition that plaintiffs may not allege a substantive due-process claim under the Due Process Clause in addition to a procedural due-process claim.

Moreover, M. Romero's procedural and substantive due-process claims allege different injuries and different facts against different Defendants.  See Amended Complaint ¶¶ 67-121, at 7-12.   The Jail Defendants argue that the procedural and substantive claims are the same, because they both rely on the conditions of confinement.   See Tr. at 8:1-25 (Huss)("[H]e arguably would not have any procedural due process component without the atypical conditions or the punishing conditions."); id. at 9:18-20 (Huss)("I don't think you can just state your poor condition claim twice.").  Although both claims allege inhumane conditions of confinement, they assert different harms, allege different facts, and are against different Defendants.   The procedural due-process claim asserts a constitutional injury from being subjected to inhumane

conditions <u>without process</u>, while the substantive due-process claim addresses the inhumane conditions themselves as well as the lack of medical care.  <u>See</u> <u>Craig v. Eberly</u>, 164 F.3d at 495. For example, even if Sandoval held a classification review hearing every week, each time deciding to continue A. Romero's segregation, but the confinement conditions were inhumane, M. Romero could pursue a substantive due-process claim, even though she could not pursue a procedural due-process claim.  <u>See</u> Tr. at 23:22-24:5 (Court).  The Jail Defendants agree that, on this factual scenario, "at that point he has a substantive due process claim based on the conditions of confinement and/or the related medical care."  Tr. at 24:14-19 (Huss).

M. Romero explained that she may ultimately be able to pursue only one claim or the other based on how the facts develop.  <u>See</u> Tr. at 13:1-5 (Coyte).  She explained that she wanted to keep both claims in the case, at least until after further discovery fleshes out the facts, because she was seeking to procure two different remedies.  <u>See</u> Tr. at 14:1-25 (Coyte).  In the procedural due-process claim, she focused on ensuring that jails perform "classification reviews, the protections that are placed in jails and prison to protect people like Mr. Romero," which are not part of the substantive due-process claim.  Tr. at 14:13-17 (Coyte)("[W]e want those things to be relevant in the analysis in order to be able to protect others from going through the same experiences.  We want process in punishing conditions.").  In contrast, in the substantive due-process claim, she "want[s] to deter other people or even the warden themselves from giving process and then violating the shocking the conscience standard."  Tr. at 14:17-25 (Coyte).  M. Romero explained that she seeks to pursue both claims, because discovery might reveal that Billy "gave many classification reviews," in which case M. Romero would be able to allege only a substantive due-process claim.  Tr. at 15:1-9 (Coyte).  The Court agrees that discovery may reveal that only one or the other claim exists, but M. Romero has pled sufficient and plausible

facts to state a claim for both procedural and substantive due process violations.  Accordingly, the Court will not dismiss the substantive due-process claim.

## III.   THE AMENDED COMPLAINT ALLEGES FACTS SUFFICIENT TO STATE A PLAUSIBLE ADA CLAIM.

To state a Title II ADA claim, the Tenth Circuit requires plaintiffs to "allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability."  Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1193 (10th Cir. 2007).  The Defendants appear to recognize that the Amended Complaint contains allegations that could form an ADA claim.  See Tr. at 45:12-18 (Huss); id. at 46:12-15 (conceding that the Amended Complaint contains "a couple" allegations "that may be protected by the ADA").  They argue, however, that the Court should disregard those allegations, because they are formulaic recitations of an ADA claim's elements.  See Tr. at 45:12-18 (Huss)(asserting that the "plaintiff throws in essentially a couple . . . conclusory allegations that he's also deprived of similar instances of prison life," but that these were conclusory allegations that the Court should disregard).  The Court disagrees with this assessment.

Even if the Amended Complaint includes other factual assertions that do not state an ADA claim,[12] it also includes allegations sufficient to state a plausible claim.  First, the Amended Complaint alleges that A. Romero is a qualified individual, as he suffers from a mental disability.  See Amended Complaint ¶¶ 22-25, at 3-4.  See Gohier v. Enright, 186 F.3d 1216, 1217 (10th Cir. 1999)(observing that no parties challenged that a paranoid schizophrenic was a "qualified

---

[12]M. Romero agreed that "medical care from the case law isn't part of an ADA claim, but visitation in paragraph 129, group therapy, religious services, and recreation opportunities all be[ing] denied as a result of his mental illness" all form an ADA claim.  Tr. at 48:1-5 (Coyte).

individual" under the ADA); Hargrave v. Vermont, 340 F.3d 27, 35 (2d Cir. 2003)(noting that no parties disputed that a person who suffered from paranoid schizophrenia was a "qualified individual" under the ADA).   The Defendants do not deny that suffering from paranoid schizophrenia makes A. Romero a "qualified individual" under the ADA.   Second, it alleges that a public entity -- the Curry Detention Center -- denied A. Romero the benefits of its services, programs, or activities.   See Amended Complaint ¶¶ 122-139, at 13-14.   The Supreme Court has held that the ADA's Title II applies to state prisons.   See also Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998)("State prisons fall squarely within the statutory definition of 'public entity' . . . .").   See Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1993 (10th Cir. 2007)(applying Title II to "discrimination against inmates detained in a county jail").

Further, M. Romero has sufficiently alleged that A. Romero was "excluded from participation in or denied the benefits of a public entity's services, programs, or activities," Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d at 1193, which amounted to "both discrimination and a failure to accommodate under the ADA," Amended Complaint ¶ 138, at 14. Discrimination under the ADA may include a defendant's failure to make reasonable accommodations to the needs of a disabled person.   See Tennessee v. Lane, 541 U.S. 509, 531 (2004)(stating that Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion" or discrimination); Melton v. DART, 391 F.3d 669, 672 (5th Cir. 2004)(stating that, under the ADA's Title II, "public entities generally are required . . . to make reasonable modifications to avoid discrimination on the basis of disability"); McCoy v. Tex. Dep't Crim. Justice, 2006 WL 2331055, at *7 & n.6 (S.D. Tex. Aug. 9, 2006)(Jack, J.)("In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because

the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.")(internal citations omitted).  The Supreme Court has stated that prisons "provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."  Penn. Dep't of Corr. v. Yeskey, 524 U.S. at 210.

More recently, in United States v. Georgia, 546 U.S. 151 (2006), the Supreme Court noted that "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [plaintiff's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted exclusion from participation or denial of the benefits of the prison's services, programs or activities." 546 U.S. 157 (internal quotation marks, brackets, ellipses, and citation omitted).  Courts have repeatedly held that an inmate may establish an ADA claim "if he is unable to access the prison's exercise equipment." Norfleet v. Walker, 2011 WL 1085266, at *3 (S.D. Ill. March 22, 2011)(Gilbert, J.).  See Castle v. Knowles, 2010 WL 2232394, at *3 (E.D. Cal. June 3, 2010)(Teilborg, J.)(concluding that the plaintiff stated an ADA claim as a result of "his inability to participate [in meaningful exercise] because of the alleged violations of Title II").  In summary, the "ADA thus not only prohibits public entities from discriminating against the disabled, it also prohibits public entities from excluding the disabled from participating in or benefitting from a public program, activity, or service 'solely by reason of disability.'"  Lee v. City of Los Angeles, 250 F.3d 668, 691 (9th Cir. 2001)(emphasis in original).  "[M]ental health services and other activities or services undertaken by law enforcement and provided by correctional facilities to those incarcerated are 'services, programs, or activities of a public entity' within the meaning of the ADA."  Lee v.

City of Los Angeles, 250 F.3d at 691.  In line with this case law, the Amended Complaint asserts that A. Romero was denied access to the Curry Detention Center's typical programming and recreational facilities, including recreation, group therapy, religious services, commissary, and visitation.  See Amended Complaint ¶¶ 128-129, at 13.

Finally, the Amended Complaint alleges that the Defendants have a practice and policy of excluding the mentally ill from the Curry Detention Center's programs and activities by placing them in solitary confinement, thereby linking the exclusion from services to the disability in question.  See Amended Complaint ¶¶ 122-139, at 13-14.  See also J.L. v. N.M. Dep't of Health, 2016 WL 1169407, at *18 (D.N.M. Feb. 24, 2016)(Vazquez, J.)(explaining that the plaintiffs could prove that the defendants discriminated against the plaintiffs by reason of their disabilities by alleging that the defendants "treated members of a similarly-situated class differently"). Further, the Amended Complaint alleges that the Defendants knew of A. Romero's disability, and intentionally excluded him from the Curry Detention Center's programs and activities because of that disability.  See Amended Complaint ¶165, at 17 (asserting that the jail records and medical files gave the Defendants notice of A. Romero's serious disability); id. ¶ 148, at 15 (alleging that Sandoval had personal notice of A. Romero's disability); id. ¶ 80, at 9 (asserting that Lucero had personal knowledge of A. Romero's disability); id. ¶ 118, at 12 (alleging that the Defendants "placed him into solitary confinement based solely on his mental health problems"). The Amended Complaint therefore alleges facts that could establish that the Defendants excluded A. Romero from programs or activities solely by reason of his mental disability.  These allegations are specific factual assertions -- not speculative and devoid of any context as the Defendants suggest.  Accordingly, the Amended Complaint plausibly states an ADA claim.

Additionally, the Response clarifies that M. Romero sues "both Billy and Sandoval" in their "*official* capacities." Response at 22 (emphasis in Response). The Amended Complaint states that it asserts the ADA claim against the "Official Capacity Defendants." Amended Complaint at 13. Claims against governmental individuals in their official capacity[13] are not subject to dismissal under qualified immunity. Murphy v. Bitsoih, 320 F. Supp. 2d 1174, 1187-88 (D.N.M June 1, 2004)(Vazquez, J.)(stating that the defendants "are not entitled to qualified immunity in their official capacities"). Qualified immunity is therefore not available on this claim, as the Defendants appear to recognize. See Response at 22 (observing that the "Defendants originally sought qualified immunity on this count," but "drop[ped] this argument" in their Motion).

## IV.  THE COURT WILL NOT PRECLUDE MONELL LIABILITY ON THE BASIS THAT M. ROMERO PLED IT AS A SEPARATE COUNT.

The Jail Defendants do not contend that M. Romero alleges insufficient allegations to assert a Monell theory of liability. See Tr. at 52:20-25 (Huss)("I'm not arguing an insufficiently of the allegations about policy. He's got those in there for sure. What I'm arguing is that you

---

[13]The Court and numerous Courts of Appeals have concluded that "Title II of the ADA does not provide for individual capacity suits against state officials." Braverman v. New Mexico, 2011 WL 6013587, at *22 (emphasis added). See J.H. ex rel. J.P. v. Bernalillo Cty., 2014 WL 3421037, at *99 (stating that no claim against an official in his individual capacity exists under Title II of the ADA); Butler v. City of Prairie Village, Kan., 172 F.3d at 744; Badillo v. Thorpe, 158 F. App'x at 211; Carten v. Kent State Univ., 282 F.3d at 396-97 (holding that a defendant must be held responsible in "his or her official capacity for violating Title II, which by its terms applies only to 'public entit[ies]'"); Garcia v. SUNY Health Sciences Ctr. of Brooklyn, 280 F.3d at 107 ("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."); Alsbrook v. City of Maumelle, 184 F.3d at 1005 n.8 ("[T]he commissioners may not be sued in their individual capacities directly under the provisions of Title II. Title II provides disabled individuals redress for discrimination by a 'public entity.'"); Busby v. City of Orlando, 931 F.2d at 772 ("The relief granted under Title VII [of the Civil Rights Act, 42 U.S.C. § 2000e(b), which defines 'employer' in the same way as the ADA,] is against the *employer*, not individual employees whose actions would constitute a violation of the Act."); Mason v. Stallings, 82 F.3d at 1009; Shabazz v. Texas Youth Comm'n, 300 F. Supp. 2d at 473.

don't get to take your one claim and multiply it into three or four claims.").  They argue only that the Monell claim should not be labeled as a separate count.  See Tr. at 52:20-25 (Huss).

The Jail Defendants are correct that the Monell claim is not a separate, stand-alone claim "for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 439 (2d Cir. 2009)(emphasis in original).  Of course, the Monell liability fails if M. Romero cannot prove a constitutional violation in her other counts. See Graves v. Thomas, 450 F.3d at 1218.  In other words, if the Defendants show that they did not violate A. Romero's constitutional rights, then the Court must dismiss the Monell claim. Although the Jail Defendants are correct that there is no independent Monell claim, they have not demonstrated that M. Romero cannot extend liability to Curry County under Monell.

The few courts that have precluded plaintiffs from pleading separate Monell claims have done so when the plaintiff has made clear that it asserts municipal liability in the counts alleging constitutional violations, and the Monell count therefore adds nothing to the complaint.  See Second Amendment Arms v. City of Chicago, No. 10-CV-4257, 2012 WL 4464900, at *11 (N.D. Ill. Sept. 25, 2012)(Dow, Jr., J.); Maui Vacation Rental Ass'n, Inc. v. Cty. of Maui, 2007 WL 4440962, at *15 (D. Haw. Dec. 19, 2007)(Seabright, J.)(dismissing the separate Monell count, because the plaintiff could establish municipal liability in another count).  For instance, the Northern District of Illinois observed that the "Plaintiffs have alleged -- in other counts -- that the City, by way of the Ordinance, has violated their constitutional rights," and that the "separate *Monell* claim . . . . duplicates the surviving § 1983 claims brought in Counts I-VIII or states only a theory under which Plaintiffs might recover."  Second Amendment Arms v. City of Chicago,

2012 WL 4464900, at *11.   The Jail Defendants have pointed to no Tenth Circuit authority prohibiting plaintiffs from pleading municipal liability separately.

The Jail Defendants cite the district court order dismissing the <u>Monell</u> claim in <u>Borde v. Board of County Commissioners of Luna County, New Mexico</u>, No. CIV 09-1185 WDS/GBW. <u>See</u> Motion at 18-19.   There, the Honorable Daniel Schneider, United States Magistrate Judge for the District of New Mexico, dismissed the <u>Monell</u> claim, <u>not</u> because the plaintiffs pled it as a separate count, but because "the Court has dismissed Counts I and II against all defendants, including Luna County," and no <u>Monell</u> liability could obtain.   <u>Borde v. Bd. of Cty. Comm'rs of Luna Cty., N.M.</u>, No. CIV 09-1185 WDS/GBW, Memorandum Opinion and Order at 9, filed January 20, 2012 (Doc. 110).   Moreover, in 2013, the Tenth Circuit noted that the plaintiff "also asserted a separate claim against the County under the *Monell* doctrine," yet the Tenth Circuit made no statements indicating that the plaintiff could not raise municipal liability in a separate count.   <u>Borde v. Bd. of Cty. Comm'rs of Luna Cty., N.M.</u>, 514 F. App'x 795, 798 (10th Cir. 2013).

Here, M. Romero explains that she pleads Count IV separately "to make the complaint more clear and easy to understand."   Response at 22.   She states that, "instead of mixing facts against official capacity defendants with facts directed at individual capacity defendants, Plaintiff has chosen to separate them."   Response at 22.   M. Romero further makes clear that any <u>Monell</u> liability derives from "the violation of Plaintiff's procedural and substantive due process rights."   Response at 22 (citing Amended Complaint ¶ 156, at 16).   Count IV pleads sufficient facts to support a theory of liability implicating Curry County, which the Jail Defendants do not dispute.   As is required to establish municipal liability under § 1983, M. Romero has alleged: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom

exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218; Amended Complaint ¶¶ 140-156, at 14-16. The Jail Defendants acknowledge that M. Romero "may attempt to use the *Monell* theory, of illustrating official policy acts of the public body, to attach liability to his § 1983 claims." Motion at 19.  The Court sees no reason to dismiss the Monell claim on the basis that M. Romero pled it separately.  The Defendants are on full and accurate notice of M. Romero's claims.  If the Court dismisses claims against the Jail Defendants, it is clear that it will need to dismiss the Monell claim against Curry County.  Given that there is no confusion, there is no need to dismiss the pleadings.  That busy work is unnecessary at this stage.

**IT IS ORDERED** that the Defendants' Rule 12(c) Motion for Judgment on the Pleadings, filed May 5, 2016 (Doc. 97), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and Intervenor:*

Matthew E. Coyte
Coyte Law P.C.
Albuquerque, New Mexico

   *Attorney for the Plaintiff*

Dennis K. Wallin
Brandon Huss
Wallin, Huss, & Mendez, LLC
Moriarty, New Mexico

   *Attorneys for Defendants Board of County Commissioners for the County of Curry, Tori Sandoval, and Ecipio Lucero*

Luis E. Robles
Nicholas S. Autio
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Gerry Billy*

Alfred A. Park
Geoffrey D. White
Kevin D. Fowler
Lawrence M. Marcus
Park & Associates, LLC
Albuquerque, New Mexico

    *Attorneys for Defendants Correct Care Solutions and Andrew Fotopolus*